IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE WORKMAN and ROBERT WORKMAN as Administrators of the Estate of ASHLEY WORKMAN, et al.,** | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **THE A.I. DUPONT HOSPITAL FOR CHILDREN OF THE NEMOURS FOUNDATION, et al.,** | : | |
| Defendants | : | NO. 06-743 |

**MEMORANDUM**

PRATTER, J.                                                                                                   JULY 27, 2007

      Plaintiffs Diane and Robert Workman, as administrators of their daughter's estate and in their own right, brought this action against Nemours Foundation for wrongful death and negligent supervision, monitoring and retention of health care providers, and against William I. Norwood, M.D., Ph.D, for wrongful death, negligence and lack of informed consent seeking damages arising from the death of the Workmans' daughter, Ashley, following heart surgery performed by Dr. Norwood. The Defendants, Nemours Foundation and Dr. Norwood (collectively "Nemours"), filed a Motion for Summary Judgment, contending the Workmans' claims are time-barred. The Workmans oppose the Motion on the grounds that the doctrine of fraudulent concealment tolls the statute of limitations. Because the fraudulent concealment doctrine does not apply under the circumstances presented here, the Workmans' claims are time-barred and, therefore, the Court will grant summary judgment in favor of the Defendants.

**FACTUAL BACKGROUND**

      Prior to Ashley Workman's birth on October 5, 1999, the Workmans learned that Ashley

had congenital heart defects. Following this obviously dismaying diagnosis, the Workmans were referred to A.I. duPont Hospital for Children, located in Delaware, and to Dr. Norwood, who was described as the "best surgeon." Shortly after her birth, Ashley was transferred to A.I. duPont Hospital for Children where doctors diagnosed Ashley with three specific heart defects: transposition of the great arteries, ventricular septal defect and hypoplastic descending aorta. Dr. Norwood performed surgery on Ashley to treat these defects two days after her birth.

For a year following the surgery, Ashley received regular check-ups from Dr. A. Majeed Bhat, M.D., a DuPont cardiologist, to monitor her heart condition. Approximately one year after her birth, upon the advice of Dr. Bhat, Ashley's parents consented to a second heart surgery.

On February 22, 2001, Ashley underwent a second heart surgery, again performed by Dr. Norwood at A.I. duPont Hospital for Children, during which Dr. Norwood used an allegedly controversial cooling procedure. The Workmans allege that they received no information regarding the cooling procedure and its controversial nature (i.e., that it was not widely used and/or that it was disfavored by the medical establishment). Following the surgery, Ashley never regained consciousness and experienced a "crash," that is, "a drop in blood pressure and heart rate requiring resuscitative measures."[1]

Mrs. Workman spoke to Dr. Norwood once, immediately after the surgery. Referring to the crash, Mrs. Workman allegedly asked Dr. Norwood if Ashley was going to "have these problems again." According to Mrs. Workman, Dr. Norwood responded that "[Ashley] wasn't going to have it again and she was fine. She was going to be okay." (Def. Mot. Ex. B, Diane

---

[1] The Workmans allege that Dr. Norwood's cooling technique was the cause of the crash. They also allege that Dr. Norwood knew this technique differed from the advice of medical literature.

Workman Deposition at 115.)  The hospital staff also expressed optimism regarding Ashley's prognosis.  (D. Workman Dep. at 122.)  There is no evidence in the record that the Workmans had any subsequent contact with Dr. Norwood.

The Workmans later spoke with Dr. Bhat, who informed them that Ashley had suffered brain damage during the 20 minutes it had taken to revive her.  (D. Workman Dep. at 117-18.)  They also spoke to a neurologist who told them Ashley had limited brain activity.  (D. Workman Dep. at 123.)  Some members of hospital staff allegedly expressed surprise that Ashley was suffering from post-surgery complications because her first surgery had been successful and because "apparently the [second] surgery went well.  They fixed the heart.  She crashed. . . . So they were confused as to why she crashed."  (Def. Mot. Ex. C, Robert Workman Deposition at 67, 68.)  After being removed from life support, Ashley died on February 25, 2001, three days after the second surgery.

The Workmans did not ask, and were not told, the cause of Ashley's death, beyond the fact that she suffered severe brain damage after her surgery.  (D. Workman Dep. at 125.)  Apparently on the basis of their own observations, as well as conversations with Dr. Bhat and the hospital staff, Mr. and Mrs. Workman simply assumed that Ashley's death was the result of complications from surgery.  As Mrs. Workman stated, "[w]e just assumed it was from surgery.  Just something that happened. . . . We assumed it happened from when she crashed is what I'm saying, and it's just something that happened and she crashed because of surgery."  (D. Workman Dep. at 127-28.)  Mr. Workman understood Ashley's crash to be "a complication from surgery," and stated that he and his wife did not inquire as to what caused the crash because "when they told us it was a complication from surgery, that was it.  We just focused on making funeral

3

arrangements, the kids." (R. Workman Dep. at 67, 75.)

Approximately three years later, around February 22, 2004, the Workmans state that they discovered through media reports that A.I. DuPont Hospital for Children had discharged Dr. Norwood. The Workmans subsequently requested Ashley's medical records from the hospital, and eventually filed this suit, alleging that the "true nature of the treatment rendered to Ashley Workman was fraudulently concealed" and that "[t]here was no manner by which [the Workmans] could reasonably have considered that medical negligence occurred until the firing of Dr. Norwood." (Amended Complaint ¶ 28). Thus, assert the Workmans, pursuant to the fraudulent concealment doctrine, the statute of limitations should be tolled until February 22, 2004.

**JURISDICTION**

This Court has jurisdiction based upon the existence of federal questions arising under and pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as well as 28 U.S.C. §§ 1331 and 1367. Although the Workmans voluntarily dismissed their federal question claim, this Court, pursuant to 28 U.S.C. § 1367(c), continues to exercise supplemental jurisdiction over the Workmans' state law claims.

**LEGAL STANDARDS**

**A.     Summary Judgment Standard**

In a motion for summary judgment, the moving party must identify for the court "those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). To overcome summary judgment,

the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In deciding a motion for summary judgment, the court should view the facts and make all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 261 (1986). If the nonmoving party fails to show evidence that demonstrates a genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. Celotex, 477 U.S. at 322.

**B.     Choice of Law**

Because the events giving rise to this suit occurred in Delaware, the Court must determine whether Delaware or Pennsylvania law applies with respect to the statute of limitations.[2]

A federal district court exercising supplemental jurisdiction over state law claims must apply the choice-of-law rules of the state in which it sits. Gluck v. Unisys Corp., 960 F.2d 1168, 1179 n.8 (3d Cir. 1992). Therefore, the Court will apply Pennsylvania choice of law principles in determining whether Delaware or Pennsylvania law governs the Workmans' claims.

Pennsylvania courts apply the statute of limitations of the forum, unless Pennsylvania's borrowing statute applies. Mack Trucks, Inc. v. Bending-Westinghouse Automotive Air Brake Co., 372 F.2d 18, 20 (3d Cir. 1966); Deleski v. Raymark Indus., Inc., 819 F.2d 377, 379 n.2 (3d Cir. 1987). Pennsylvania's borrowing statute mandates that "[t]he period of limitation applicable to a claim accruing outside [the Commonwealth of Pennsylvania] shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth,

---

[2] Statutes of limitations are considered substantive law for purposes of the Erie doctrine. Dixon Ticonderoga Co. v. Estate of O'Connor, 248 F.3d 151, 160-61 (3d Cir. 2001) (citing Guaranty Trust Co. v. York, 326 U.S. 99, 110 (1945)).

whichever first bars the claim." 42 Pa. Const. Stat. Ann. § 5521(b) (2006). Pennsylvania and Delaware both apply a two-year statute of limitations in medical negligence suits. See 42 Pa. Const. Stat. Ann. § 5524(2) (2006); Del. Code Ann. Tit. 18, § 6856 (2007). Therefore, the borrowing statute is not applicable in this case, and the Pennsylvania statute of limitations applies.[3]

**DISCUSSION**

**A.      The Statute of Limitations**

Under Pennsylvania law, the statute of limitations for personal injury actions is two years. 42 Pa. Const. Stat. Ann. § 5524(2) (2006). The statute of limitations begins to run when a party actually knows or reasonably should know of an injury and its cause. Fine v. Cheecio, 870 A.2d 850, 861 (Pa. 2005). The question of when reasonable diligence would have made the injured party aware of the injury and its cause generally is a question of fact. Wawrzynek v. Statprobe Inc., 422 F. Supp. 2d 474, 480 (E.D. Pa. 2005). However, where the "facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." Cochran v. GAF Corp., 666 A.2d 245, 248 (Pa. 1995). In personal injury cases, even cases involving events as heart-wrenching as the birth, exigent surgical need and death of a newborn, the cause of action typically arises when the injury occurs. Fine, 870 A.2d at 857. Thus, the Court is obliged to consider and be guided by legal principles even in the face of facts

---

[3] Delaware law provides an extension for the statute of limitations if the injury was unknowable within two years. Del. Code Ann. Tit. 18, § 6856. In this case, the injury was knowable within two years and, even if it was not, the borrowing statute would mandate application of the Pennsylvania statute of limitations. See Farrell v. A.I. duPont Hospital, No. 04-3877, 2006 U.S. Dist. LEXIS 49079, at *12 n.4 (E.D. Pa. July 19, 2006). The parties do not contest that Pennsylvania, rather than Delaware, law applies to the Workmans' state law claims.

that engender, as do these, sincere appreciation of the human tragedy of loss experienced here by Mr. and Mrs. Workman. Where there are no factual disputes regarding what the injured party knew about the injury and its cause, summary judgment is appropriate if the nonmoving party fails to produce evidence sufficient to show that under Pennsylvania law the acts of the defendant amount to fraudulent concealment. Cochran, 666 A.2d at 248.

**B.      Fraudulent Concealment**

Certain exceptions apply to the statute of limitations, including the fraudulent concealment doctrine, which is at issue in this motion. Under the fraudulent concealment doctrine, the plaintiff bears the burden of proving that the statute of limitations should be tolled. Fine, 870 A.2d at 860. The Pennsylvania Supreme Court has held that "while it is for the court to determine whether estoppel [fraudulent concealment] arose from the established facts, it is for the jury to say whether the remarks that constitute the fraud or concealment were made." Id.

Fraudulent concealment provides that "the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." Fine, 870 A.2d at 860. Fraudulent concealment need not consist of intentional fraud, but may occur as a result of innocent deception or concealment. Id. At a minimum, however, fraudulent concealment must involve "an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991). Thus, for the doctrine of fraudulent concealment to apply, there must be some affirmative action on the part of the defendant to justify tolling the statute of limitations. See Ciccarelli v. Carey Canadian Mines, 757 F.2d 548, 557 (3d Cir. 1985). Moreover, the plaintiff must prove the existence of fraudulent

concealment "by clear, precise, and convincing evidence." Fine, 870 A.2d at 860; see also Gravinese v. John-Manville Corporation, 471 A.2d 1233, 1238 (Pa. Super. Ct. 1984).

Even if fraudulent concealment is proved, the plaintiff does not need to have actual knowledge of the injury before the statute of limitations begins to run. Instead, the statute of limitations will commence when the party knows or reasonably should know of the injury and its cause. Fine, 870 A.2d at 861.[4] A putative plaintiff need not be aware that he or she may have a cognizable cause of action for the limitations period to begin. See Urland v. Merrell-Dow Pharmaceuticals, Inc., 822 F.2d 1268, 1275 (3d Cir. 1987) (holding that the injured party did not need to be aware of a cause of action in order for the statute of limitations to begin running). Finally, to establish fraudulent concealment, the injured party must also prove that they would not have discovered the injury or the cause with reasonable diligence. Wawrzynek, 422 F. Supp. 2d at 479.

Given that the injury, i.e., Ashley's death, took place more than two years before the commencement of the suit, the Workmans' claims are time-barred absent evidence sufficient to conclude the doctrine of fraudulent concealment applies and the statute of limitations should be tolled. Nemours contends that there is insufficient evidence in the record to support a finding of fraudulent concealment and that the Workmans' deposition testimony demonstrates they knew in 2001 that Ashley's death was the result of complications from surgery. As a result, argues Nemours, the Workmans either knew or reasonably should have known the extent of Ashley's

---

[4] The Workmans argue that under the doctrine of fraudulent concealment, the duty to be reasonably diligent arises when a plaintiff has *actual* knowledge of the injury. (Pl. Response 19-20). This argument fails, however, because Fine explicitly held that "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or *reasonably should know* of his injury and its cause." Fine, 870 A.2d at 861 (emphasis added).

injury and its cause on February 25, 2001.

The Workmans, for their part, contend that the "true nature of the treatment" given to Ashley was fraudulently concealed and the Workmans could not have conceived of the possibility that medical negligence occurred prior to viewing the media reports regarding Dr. Norwood on February 22, 2004. The Workmans point to several events that they claim demonstrate fraudulent concealment, including (1) Dr. Norwood's silence before and after the surgery; (2) Dr. Norwood's statements after the surgery; (3) the hospital staff's statements after the surgery; and (4) alleged misrepresentations on Ashley's hospital chart.

### 1. Dr. Norwood's Silence and Fiduciary Duty

The Workmans contend that Dr. Norwood had a "fiduciary duty to explain to the Workmans that the surgical procedures he employed may have harmed Ashley," and that Dr. Norwood's failure to do so constitutes fraudulent concealment. Specifically, the Workmans argue that, prior to surgery, Dr. Norwood had a duty to inform the Workmans of the cooling technique Dr. Norwood used, and to explain that this procedure was not widely used in the medical profession.[5] Finally, according to the Workmans, Dr. Norwood also should have sought out the Workmans *after* the surgery to explain that the cooling process might have been the cause of Ashley's "crash."

The doctrine of fraudulent concealment generally requires an independent affirmative act on the part of the defendant. Bohus, 950 F.2d at 925; see also Gee v. CBS Inc., 471 F. Supp. 600, 623 (E.D. Pa. 1979) (explaining the general rule in Pennsylvania regarding fraudulent

---

[5] The Workmans contend that the cooling procedure was highly unusual and risky, which the Court will assume to be true for purposes of this Motion.

concealment and affirmative acts); Ciccarelli, 757 F.2d at 557 (explaining that the defendant's affirmative actions must justify tolling of the statute of limitations). The affirmative act must cause the injured party to deviate from his right of inquiry. Fine, 870 A.2d at 860.

Under Pennsylvania law, a doctor's silence cannot be construed as an affirmative act for the purpose of establishing fraudulent concealment, even where such silence constitutes a breach of fiduciary duty.[6] The various cases cited by the Workmans for the proposition that a doctor holds a greater duty to inform are not controlling.[7] The sole Pennsylvania case cited deals with a discovery order and does not address the doctrine of fraudulent concealment as it relates to a physician's conduct. See White v. Behlke, 65 Pa. D.&C. 4th 479 ( Ct. Com. Pl. 2004).

The Workmans have not produced, and the Court has not discovered, any corresponding precedent under Pennsylvania law. Pennsylvania courts frequently have applied the fraudulent concealment doctrine in medical malpractice claims, but have not given any suggestion or

---

[6] In this regard, doctors are not subject to the same obligations as lawyers who must, as a matter of professional responsibility and ethical conduct, disclose information of their own questionable conduct if necessary in order to comply with, for example, Rule 1.4 of the Rules of Professional Conduct.

[7] See, e.g, Henrich v. Sweet, 308 F.3d 48, 69 (1st Cir. 2002) (holding that doctor's silence could amount to fraudulent concealment in light of the doctor-patient relationship); Craft v. Vanderbilt, 18 F. Supp. 2d 786, 797 (M.D. Tenn. 1998) (finding that in a physician-patient relationship there is an affirmative duty to disclose, which renders failure to disclose known facts fraudulent); Wohlgemuth v. Meyer, 18 F. Supp. 2d 786 (Cal. App. 1956) (holding that if a patient dies under a physician's care, the spouse has a right to know the cause of death, since it is a material fact relevant to the patient's rights and interests); White, 65 Pa. D.&C. 4th 479 (holding that even in the context of litigation, the physician's first duty is to his patient); Pedersen v. Zielski, 822 P.2d 903 (Alaska 1991) (holding that even though an informed reading of the medical records may have disclosed the cause of the patient's injuries, it does not necessarily follow that the plaintiff's reliance on the misrepresentations of the defendant doctor were unreasonable, and plaintiff should have the opportunity to prove estoppel); Nutty v. Jewish Hosp., 571 F. Supp. 1050, 1054 (S.D. Ill. 1983) (same); Krueger v. St. Joseph's Hosp., 305 N.W.2d 18, 20-21, 25 (D.N.D. 1981) (same).

indication that a defendant's fiduciary relationship compels the defendant to disclose a potential cause of action. See, e.g., Fine, 870 A.2d at 861-62 (focusing on the doctor's affirmative acts); Deemer v. Weaver, 187 A. 215, 216 (Pa. 1936) (holding that "mere silence or concealment does not toll the running of the statute" and finding fraudulent concealment based on affirmative acts, rather than a fiduciary relationship). Federal courts adjudicating state law claims must defer to the substantive law of the appropriate state jurisdiction. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). Therefore, the Court will not expand the fraudulent concealment doctrine to encompass a doctor's mere silence in addition to his or her affirmative acts as this is contrary to Pennsylvania law.

### 2. Dr. Norwood's Statements after the Surgery

The Workmans contend that during Dr. Norwood's conversation with Mrs. Workman after Ashley's surgery, Dr. Norwood affirmatively misrepresented the nature of the surgery and Ashley's recovery, which operated to divert the Workmans from the possibility of medical negligence. Assurances of a physician that "lull a patient into a false sense of security may constitute fraudulent concealment." Bohus, 950 F.2d at 925. However, a party's reliance will not be deemed reasonable when common sense should dictate a different conclusion. Id. In Bohus, doctors repeatedly assured the patient that the discomfort she felt after foot surgery would soon dissipate, even though this was not true. In that case, the court held that there was sufficient evidence for the jury to find the doctors' statements constituted fraudulent concealment, and that the plaintiff reasonably relied on such statements. Id. at 926.

The Workmans contend that Dr. Norwood's statements likewise operated as an assurance that the surgery went well and, as a result, the Workmans' continued reliance on these assurances

after Ashley's death was reasonable.[8]  According to Mrs. Workman, after Ashley "crashed," Dr. Norwood told her that Ashley "would be fine."  (D. Workman Dep. at 115.)  However, another doctor subsequently informed the Workmans that Ashley had suffered severe brain damage and things "did not look good."  (D. Workman Dep. at 117-18.)  A few days later, Ashley died.  The Workmans assert that they reasonably interpreted the remarks by Dr. Norwood to mean that no negligence had occurred during the surgery, and thus were diverted from pursuing their claim.

Even when taken in the light most favorable to the Workmans, as required in the context of this Motion, Dr. Norwood's statements do not constitute fraudulent concealment under Pennsylvania law because the subsequent event of Ashley's death put the Workmans on notice of the injury and its cause.  Unlike Bohus, where the doctor assured the patient the injury was a temporary side effect, here there was an actual injury, that is, Ashley's death.  The Pennsylvania Supreme Court has held, albeit in a slightly different context, that death puts survivors on notice that an injury has occurred, and that they then have the obligation to proceed with any appropriate investigations.  See Pastierik v. Johns-Manville Corporation, 526 A.2d 323, 326 (Pa. 1987).  While this rule generally applies to issues of discovery rather than fraudulent concealment, death can still be considered in fraudulent concealment cases to determine whether, despite the alleged concealment, a party knew or should have known of the injury and its cause.

Relying on Hall v. St. Luke's Hospital, CCP Lehigh County 2004-C-2052V (Ct. Com. Pl.

---

[8] The Workmans also cite Schaffer v. Larzelere, 189 A.2d 267 (Pa. 1963), abrogated on other grounds by Fine, 870 A.2d at 859, to support their fraudulent concealment argument.  Such reliance is misplaced, however, because Schaffer stands for the proposition that the fraudulent concealment doctrine may be asserted by a plaintiff even though a death has occurred.  It does not speak to the evidence necessary to survive summary judgment.

2006), the Workmans contend that Ashley's death did not put them on notice that a "legal injury" had occurred because of Dr. Norwood's alleged assurances. The present case, however, is distinct from Hall, which dealt with a motion for judgment on the pleadings and involved a hospital employee administering lethal doses of medication to patients. In Hall, the court held that the hospital had a statutory duty to inform patients of the events that took place, noting that the plaintiffs may not have had notice that the death was caused by the conduct of another. Hall, CCP Lehigh County 2004-C-2052V at 6.

The instant case is factually dissimilar to Hall and nearly identical to Farrell v. A.I. duPont Hospital for Children, No. 04-3877, 2006 U.S. Dist. LEXIS 49079 (E.D. Pa. July 19, 2006). In Farrell, the court emphasized that the doctor's statement that the surgery went fine could not be reconciled with the fact that the child died shortly after surgery. Id. at *20-21. Once the injury and its cause are known or reasonably should be known, confidence in the operating surgeon will not excuse the duty of reasonable diligence. Id. at *23; Kaskie v. Wright, 589 A.2d 213, 216 (Pa. Super. Ct. 1991). In another nearly identical case, the court held that even though the parents had been told conflicting statements by doctors about the success of the surgery, the parents knew of the injury (their child's death) and its possible cause on the date the child died. Everwine v. the Nemours Foundation, No. 05-3004, 2006 U.S. Dist. LEXIS 16473 (E.D. Pa. April 4, 2006). In the case at hand, doctors gave conflicting statements as to the success of the surgery, but ultimately the Workmans knew there was an injury, i.e. Ashley's death, and that it was causally related to the surgery.

Nonetheless, the present case differs from Farrell and Everwine in two respects. First, in Farrell, the child underwent two additional surgeries after complications arose, and the parents

received an autopsy report giving a precise cause of death. Here, the Workmans did not ask for or receive an autopsy. (D. Workman Dep. at 125.) Thus, the Workmans arguably have a stronger case that they were not aware of the causal connection between Ashley's death and the conduct causing her death. See Urland, 822 F.2d at 1275 (holding that "the relevant inquiry for the purposes of the statute of limitations is whether plaintiffs knew or reasonably should have known of the causal relationship between the injury and conduct causing that injury."). Second, in contrast to Everwine, the Workmans never admitted having suspicions about the surgery prior to 2004, whereas in Everwine, the parents' vocalized suspicions following the surgery weakened their claim of ignorance as to the cause of the injury.

Nevertheless, the same logic applies in all three cases. In each case, the child died shortly after surgery. Moreover, the Workmans acknowledge that they were aware Dr. Norwood performed the surgery, and that Ashley's death was the result of complications from surgery. (D. Workman Dep. at 127-28; R. Workman Dep. at 67, 68, 75.) The Workmans' admission of this knowledge eliminates any genuine issue of fact that the date of Ashley's death is the date the Workmans knew or should have known of the injury and its cause. See Bohus 950 F.2d at 925.[9]

### 3. The Hospital Staff's Statements Following Surgery

The Workmans contend that the statements of surprise by hospital staff regarding Ashley's condition diverted the Workmans from discovering any negligence. In Pennsylvania, if a doctor or nurse assures a patient that an injury is the result of natural causes, then that assurance may constitute fraudulent concealment if it diverts the patient from their right of inquiry. See

---

[9] As the Workmans acknowledge, reliance will not be excused if the representation is obviously false. Restatement (Second) Torts § 541. Here, Dr. Norwood's statement that the surgery went "fine" was proved false by Ashley's death.

Bohus, 950 F.2d 919; Burton Lister v. Siegel, 798 A.2d 231, 237-38 (Pa. Super. Ct. 2002). According to the Workmans, prior to the discovery that Ashley suffered brain damage, the hospital staff expressed optimism regarding her prognosis (D. Workman Dep. at 122), and some staff members expressed surprise that Ashley was suffering from post-surgery complications (R. Workman Dep. at 67).

Under the circumstances presented here, the statements of hospital staff members cannot be construed as fraudulent concealment. There is no evidence in the record that the staff made any statements suggesting that the complications were the result of natural causes or an "act of God." See Burton Lister, 798 A.2d at 237-38 (holding that it was possible for a jury to find a mother acted reasonably when she did not investigate the cause of her daughter's brain damage when told by her doctor it was "an act of God."). The staff's statements of surprise in this situation are not analogous to assurances that the injury was the result of natural causes or a divine act because mere expressions of surprise or other reactions do not contain any information, misleading or otherwise, as to the cause of the complications. Thus, the hospital staff's statements here differ significantly from the statements made by medical personnel in Bohus and Burton-Lister because the latter affirmatively emphasized that the injuries in question were unavoidable or would dissipate shortly.

Moreover, mistake or misunderstanding will not operate to toll the statute of limitations. Cochran, 666 A.2d at 249. It is plausible that the Workmans interpreted the surprise of the hospital staff, or the seriousness of Ashley's condition, to mean that Ashley suffered complications as a result of natural causes. However, no one affirmatively told the Workmans that the complications from surgery were "natural" or unavoidable. Thus, the Workmans'

interpretation is more appropriately deemed a misunderstanding or mistake than the result of any affirmative concealment.[10]

### 4. Misleading Information on the Chart

The Workmans contend that Dr. Norwood wrote "misleading and contradictory operative notes regarding Ashley's temperature at the time of her circulatory arrest and at cooling time in order to conceal his failure to adhere to common and standard medical practice," and claim such misrepresentations constitute fraudulent concealment.

Fraudulent concealment occurs where a defendant "*causes* the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." Fine, 870 A.2d at 860 (emphasis added). Here, the Workmans never asked to see Ashley's medical records prior to 2004. As the court stated in Farrell, the Workmans "may not now argue that the records would not have disclosed medical malpractice and therefore the records were futile to an investigation of a potential negligence claim." Farrell, 2006 U.S. Dist. LEXIS 49079, at *25. Thus, because the Workmans made no timely attempt to examine the medical records, there is no causal relationship between the alleged misrepresentations in the chart and the Workmans' delayed investigation. Moreover, even if the Workmans had received the chart, logic dictates that contradictory notes on a chart would arouse suspicion, rather than placate them.

In sum, the alleged misrepresentations cannot constitute fraudulent concealment because, having been discovered only after the limitations period expired, they could not have diverted the Workmans from pursuing their claim.

---

[10] The Workmans also contend that reliance on a doctor's assurances is *per se* reasonable when a patient retains confidence in the physician. The Court has not found any support for this proposition.

Thus, the doctrine of fraudulent concealment does not apply and the Workmans' claims are time-barred. In Pennsylvania, the statute of limitations will begin to run when "plaintiffs knew or reasonably should have known of the causal relationship between the injury and the conduct causing that injury . . . plaintiffs need not know that they have a cause of action or that the injury was caused by another's conduct." Urland, 822 F.2d at 1275; Huber v. McElwee-Courbis Const. Co., 392 F. Supp. 1379, 1383 (E.D. Pa. 1974) (finding Pennsylvania law does not require knowledge of the defendant's culpability in order for the statute of limitations to run); see also Farrell, 2006 U.S. Dist. LEXIS 49079, at *18 (holding that the parent was "not required to be aware of her potential cause of action for medical malpractice" for the statute of limitations to begin).

On date of Ashley's death, the Workmans knew, at a minimum, that Ashley had died, and that her death was causally related to the surgery. They also knew that Dr. Norwood performed the surgery. Under these circumstances, even if Dr. Norwood's silence was a breach of fiduciary duty amounting to fraudulent concealment, Ashley's death coupled with Dr. Bhat's explanation put the Workmans on notice of the injury and its causal relationship to the surgery. See Urland, 822 F.2d at 1275 (specific or actual knowledge of the injury or its cause is not necessary to put the plaintiff on notice).

**CONCLUSION**

Because there is insufficient evidence in the record that the Workmans were unaware of the injury and its causal connection to the surgery on the date of Ashley's death, and because nothing in the record indicates an affirmative act of concealment on the part of the Defendants, the statute of limitations cannot be tolled and the Workmans' claims are time-barred.

Accordingly, the Court will grant summary judgment in favor of the Defendants. An Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE WORKMAN and ROBERT WORKMAN as Administrators of the Estate of ASHLEY WORKMAN, <u>et al.</u>,** | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| **THE A.I. DUPONT HOSPITAL FOR CHILDREN OF THE NEMOURS FOUNDATION, <u>et al.</u>,** | : | |
| Defendants | : | NO. 06-743 |

## <u>ORDER</u>

AND NOW, this 27th day of July, 2007, upon consideration of the Defendants' Motion for Summary Judgment (Docket No. 26), the Plaintiffs' response thereto (Docket No. 32) and the Plaintiffs' Supplemental Submission (Docket No. 39), it is hereby ORDERED that the Motion is GRANTED.

The Clerk of the Court is instructed to close this case for all purposes.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge